**[Cite as *State v. White*, 2024-Ohio-5158.]**

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| STATE OF OHIO, | **CASE NO. 2024-A-0045** |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| MARVIN J. WHITE a.k.a. MARVIN JACKSON WHITE, | Trial Court No. 2019 CR 00703 |
| Defendant-Appellant. | |

## **O P I N I O N**

Decided: October 28, 2024
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Mark Majer*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Edward F. Borkowski, Jr.*, P.O. Box 609151, Cleveland, OH 44109 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1}    Appellant, Marvin White, appeals his convictions from the Ashtabula County Court of Common Pleas. We heard Appellant's first direct appeal in *State v. White*, 2023-Ohio-4092 (11th Dist.) ("*White I*"). In that case, we affirmed his convictions in part, reversed in part, and remanded, finding that Count 1, Involuntary Manslaughter with a predicate offense of Corrupting Another with Drugs, a first-degree felony in violation of R.C. 2903.04, was not supported by sufficient evidence. We ordered that Appellant be sentenced on the previously merged Count 2, Involuntary Manslaughter with a predicate

offense of Trafficking in a Fentanyl-Related Compound, a first-degree felony in violation of R.C. 2903.04. We also remanded for resentencing on Count 9, Trafficking in a Fentanyl-Related Compound, a fourth-degree felony in violation of R.C. 2925.03(A)(2), because the trial court had imposed a 36-month sentence where the maximum possible sentence was 18-months. We affirmed Appellant's convictions on the remaining counts.

{¶2} After resentencing, Appellant has raised three assignments of error arguing that his conviction on Count 2 was not supported by sufficient evidence, was against the manifest weight of the evidence, and that the record did not support the imposition of consecutive sentences.

{¶3} Having reviewed the record and the applicable caselaw, Appellant's assignments of error are without merit. His conviction on Count 2 was supported by competent credible evidence that Appellant's Trafficking in a Fentanyl-Related Compound caused the death of another by overdose and that such a death was a foreseeable consequence of Trafficking in Drugs. Further, the trial court made all necessary findings to impose a consecutive sentence under R.C. 2929.14, the record clearly and convincingly supported the trial court imposing consecutive sentences, and Appellant's sentence was not otherwise contrary to law.

{¶4} Therefore, we affirm the judgment of the Ashtabula County Court of Common Pleas.

**Substantive and Procedural History**

{¶5} On January 29, 2020, Appellant was indicted on 11 Counts: Count 1: Involuntary Manslaughter with a predicate offense of Corrupting Another with Drugs, a first-degree felony in violation of R.C. 2903.04; Count 2: Involuntary Manslaughter with a

2

predicate offense of Trafficking in a Fentanyl-Related Compound, a first-degree felony in violation of R.C. 2903.04; Count 3: Corrupting Another with Drugs, a second-degree felony in violation of R.C. 2925.02(A)(3); Count 4: Trafficking in a Fentanyl-Related Compound; a fifth-degree felony in violation of R.C. 2925.03(A)(1); Count 5: Aggravated Trafficking in Drugs, a fourth-degree felony in violation of R.C. 2925.03(A)(1); Count 6: Trafficking in a Fentanyl-Related Compound, a fifth-degree felony in violation of R.C. 2925.03(A)(1); Count 7: Aggravated Trafficking in Drugs, a third-degree felony in violation of R.C. 2925.03(A)(2); Count 8: Aggravated Possession of Drugs, a third-degree felony in violation of R.C. 2925.11(A); Count 9: Trafficking in a Fentanyl-Related Compound, a fourth-degree felony in violation of R.C. 2925.03(A)(2); Count 10: Possession of a Fentanyl-Related Compound, a fifth-degree felony in violation of R.C. 2925.11(A); and Count 11: Possessing Criminal Tools, a fifth-degree felony in violation of R.C. 2923.24(A).

{¶6} Appellant pled not guilty, and the matter proceeded to jury trial. In *White I,* we set forth the following factual summary:

{¶8} Edgar Johnson testified that he lived on West 9th Street in Ashtabula, Ohio. He said that on August 31, 2019, he lived at that residence with his sister Thelma Paul and a friend, Travis Rockwell. Thelma was 58 years old, disabled, and in chronic pain. Edgar knew Travis because he had dated Travis' mother, Danielle Rockwell.

{¶9} Edgar said that both he and Thelma were drug users. On August 31, 2019, Thelma was complaining her back was bothering her. Edgard tried to take her to the hospital, but she refused. Someone from the energy company came to the house and Edgar talked to him outside for approximately two hours. When he came back inside, he found Thelma lying on the bed not moving or breathing. Edgar called 911 and Thelma was transported to the hospital where she was pronounced dead as the result of an overdose. Edgar said that he knew of appellant but had never seen him at the house on West 9th.

{¶10} Brandon Zukoski, a police officer with the Ashtabula City Police Department, testified that he responded to the Ashtabula Medical Center

3

for an overdose and saw Thelma. Zukoski recognized her but could not put a name to the face. He continued his investigation by going to the 9th Street residence. He went into Thelma's bedroom and noted a lot of clutter, drugs, and drug paraphernalia such as "snort straws, razor blades, folded paper . . . white powder residue, . . . two lines of suspected meth . . . [and] a fold paper that had a brown packed powder on it." He said that the drugs he recovered were tested and found to be methamphetamine, heroin, and carfentanil.

{¶11} Danielle Rockwell testified and said she knew appellant because he was married into her husband's family and she also knew him as a drug dealer. She said on August 31, 2019, her son Travis contacted her asking for appellant's phone number. Danielle said Travis was using heroin at the time and appellant was the person who supplied her with heroin when she was using drugs. Danielle called appellant and told him Travis wanted to talk to him. Appellant picked up Danielle in a maroon Cadillac and went to Travis' West 9th Street residence. Travis left $20.00 for the heroin on the porch. Danielle said she left heroin on the porch then collected the money and gave it to appellant.

{¶12} Danielle said she later learned of Thelma's passing and that a police detective contacted her about the matter. She told the police about appellant dealing drugs from his residence on East 17th Street. She said she agreed to conduct a drug buy from appellant.

{¶13} On September 2, 2023, she arranged to meet appellant to buy heroin and the investigators provided her with a recording device to capture the transaction. Danielle went to appellant's house and purchased $20.00 worth of heroin. However, although appellant gave Danielle the heroin, she forgot to give him the $20.00.

{¶14} Danielle had been charged with Involuntary Manslaughter, Corrupting Another with Drugs, Trafficking in a Fentanyl-Related Compound, Aggravated Trafficking in Drugs, and Tampering with Evidence. She took a plea deal to a reduced charge of Attempted Corrupting Another with Drugs and Trafficking in Drugs with a sentence of 18 months prison in exchange for her truthful testimony against appellant. She also admitted to having prior forgery and theft convictions.

{¶15} Travis Rockwell testified that he lived at the West 9th Street residence with Thelma and Edgar in August 2019. He said that on August 31, he called his mom, Danielle, to help him buy heroin. Travis said he had recently bought a new phone and no longer had appellant's number. He said that appellant and his mom came to the house in a red Cadillac. Travis said he went to the car to pick up the drugs and that he paid appellant $30.00 for the heroin. Travis explained that Thelma contributed $20.00 to the drug

4

purchase and he paid $10.00 toward the purchase. Earlier in the day, Travis had texted Thelma asking for $20.00 to pay toward her share.

{¶16} Travis went back into the house and gave Thelma her share of the heroin and he went into the bathroom and took the drugs. He said that he used a needle to get high, while Thelma would snort the drugs. When he came out of the bathroom, Thelma had already overdosed, and Edgar was administering CPR.

{¶17} When the Ashtabula Police arrived, Travis provided a statement. He was charged for his involvement and took a plea deal to Attempted Corrupting Another with Drugs and Trafficking in Drugs with a recommended sentence of 18 months in exchange for truthful testimony in appellant's case. When pressed about whether he went out to the car to take the drugs from appellant or if Danielle came up to the house to drop them, Travis said he was unsure. However, he said that the drugs ultimately came from appellant.

{¶18} Lieutenant Michael Palinkas, with the Ashtabula City Police Department, and Detective Thomas Perry, previously of Ashtabula City Police Department, testified as to their investigation of the case. Perry said that on August 31, 2019, he interviewed Travis and Edgar about their involvement in Thelma's death. He also spoke to Danielle via phone and later in person on September 2. Perry arranged for Danielle to conduct the controlled drug buy from appellant.

{¶19} On September 3, 2019, the Ashtabula Police executed a search warrant at appellant's East 17th Street residence based on Danielle's controlled drug buy. Appellant was stopped in his vehicle at the East 17th Street address and found methamphetamine and $663.00 in currency. At the residence, officers recovered suspected drugs later identified as heroin on a water tank, three digital scales, two orange pills later identified as Buprenorphine tablets, and multiple cell phones.

{¶20} Appellant agreed to give Palinkas a statement and gave consent for officers to search his primary residence located at West 30th Street. When officers arrived at the West 30th Street residence, appellant spoke to his wife and told her that he had "done some very bad things." Officers recovered $3,000.00 and a handgun in a safe. Appellant had the key to the safe on his key ring while appellant's wife did not have a key for the safe. Officers found a total of 47 firearms.

{¶21} Dr. Luigino Apollonio, the chief toxicologist for the Cuyahoga County Examiner's Office, testified that he performed toxicology testing on a specimen of blood from Thelma. He performed a comprehensive toxicology

5

screen and determined she had fentanyl, carfentanil, morphine, and methamphetamine in her system.

{¶22} Dr. Pamela Lancaster, the Ashtabula County Coroner, determined Thelma's death was as a result of accidental overdose of a combination of fentanyl and carfentanil.

{¶23} Shay Smith, a forensic scientist at the Bureau of Criminal Investigation (BCI), analyzed suspected drugs and found the samples to be methamphetamine, a combination of heroin and carfentanil, and carfentanil. All tested samples were under 0.1 gram.

{¶24} Erin Miller, a forensic scientist at BCI, analyzed suspected drugs and found the samples to be 3.03 grams of methamphetamine, two Buprenorphine tablets, and a 1.19 gram combination of heroin, fentanyl, and carfentanil.

{¶25} The State rested and appellant called the following witnesses:

{¶26} Daniel Mulholland testified that he rents a house on East 17th Street from appellant. On September 3, 2019, he said that he went to pay his monthly rent to appellant and found him sitting on the couch unable to get up and move around. He also said appellant owns a white Cadillac. He said appellant owns a red vehicle, but that it was in the driveway and inoperable at the time.

{¶27} Annette White, appellant's wife, said she was present when the officer searched their West 30th Street residence. She said that "98 percent" of the guns seized were hers and that she acquired them through an inheritance. She said she had never seen appellant sell drugs from the house. However, she said that she worked during the day and did not know specifically what appellant did while she was at work. She also said she only went to the East 17th Street residence once a month.

{¶28} Jerry Henry, Thelma's son, testified that he lived at the West 9th Street residence but moved out a few weeks before Thelma died. He said that he had never seen appellant at the house and had never seen appellant sell drugs to Danielle or Travis. However, he said he had only met appellant two days ago. He also never saw anyone sell or give drugs at the residence. He said that he did see Thelma, Danielle, and Travis using drugs at the house.

{¶29} Raymond Hall testified that he is friends with appellant and said that most of the firearms in appellant's house belonged to his wife. He helped to pick them up in the 1980s after Annette inherited them. Elizabeth Hall, Raymond's wife, said she also went to help pick up Annette's firearms when she inherited them. She said she had never seen appellant sell drugs.

6

Case No. 2024-A-0045

{¶30} Tiffany Noble testified that she worked for appellant at his antique shop. She said that she had seen appellant selling drugs out of the antique shop while she worked there. She said appellant also sold her cocaine and heroin. Noble testified that appellant sold her a car for $3,000.00 in August 2019.

{¶31} Lester Johnson lived in the upstairs unit of the West 9th Street residence in August 2019. Johnson is Thelma's brother. He said he has known appellant for 25 years. Johnson said he was at home on August 31, 2019, but he did not see appellant come to the address.

{¶32} Andrew Sawan, a forensic scientist with BCI, testified that he performed DNA analysis on a paper bindle and a plastic bag. He said both items contained DNA profiles consistent with Thelma as well as DNA from a male with an insufficient sample for comparison to a standard. The plastic bag also contained DNA consistent with another unidentified female. Danielle's DNA standard was not available for comparison.

{¶33} Appellant testified in his own defense. He said he is retired and became addicted to opioids after receiving cancer treatment. He claimed he was no longer using heroin in August 2019 but said he was still using methamphetamine. He said that he was circumcised on August 29, 2019, and was unable to walk and stayed in bed or on the couch. He said he could not drive for four or five days. On August 31, he said he tried to get up a few times but was unable to do so. When he tried, he said he ripped stitches.

{¶34} Appellant denied leaving the house on August 31 and denied seeing Danielle or Travis. He denied knowing Thelma.

{¶35} Appellant denied ever selling drugs to Danielle or Travis. Appellant said he owed Danielle and gave her the heroin when she conducted the controlled buy. He said he was still unable to drive on September 2 during the controlled drug buy and that someone drove him to the East 17th Street address. He said he was driving on September 3 when he was arrested.

{¶36} He said the $3000.00 in the safe came from selling a car to Tiffany and $500.00 of the $663.00 found on him when he was arrested came from Daniel paying rent. He said that his red Cadillac was not operable on August 31, and he was driving a white Cadillac at the time.

*White I* at ¶ 8-36.

{¶7} The jury found Appellant not guilty on Count 7 and guilty as to the remaining Counts. The trial court sentenced Appellant. Counts 1, 2, 3, and 4 were merged as allied

7

offenses of similar import and the trial court sentenced Appellant on Count 1. Similarly, Counts 9 and 10 were merged and the trial court sentenced Appellant on Count 9. Therefore, Appellant was sentenced on Counts 1, 6, 8, 9, and 11. The trial court stated that it considered the purposes and principles of felony sentencing under R.C. 2929.11 and R.C. 2929.12. The court concluded Appellant's conduct was more serious under R.C. 2929.12 because his crimes resulted in the death of another.

{¶8}    On appeal in *White I*, Appellant argued that his conviction on Count 1 was not supported by sufficient evidence and that the trial court erred by imposing a 36-month sentence on Count 9 when the maximum possible sentence on that count was only 18 months. We agreed with these arguments in *White I*, holding that "there is insufficient evidence to sustain appellant's conviction under Count 1 because the State failed to prove the knowingly element of the predicate offense of Corrupting Another with Drugs." *Id.* at ¶ 60. We also held that "the trial court incorrectly imposed a 36-month sentence on Count 9, which was contrary to law because Count 9 was a fourth-degree felony with a maximum possible sentence of 18-months." *Id.* at ¶ 73. We affirmed the remaining portions of Appellant's convictions and remanded to the trial court for the trial court to reimpose sentence on Count 9 and to impose sentence on the previously merged Count 2.

{¶9}    On May 3, 2024, the trial court sentenced appellant on Count 2, Involuntary Manslaughter with a predicate offense of Trafficking in a Fentanyl-Related Compound, a first-degree felony in violation of R.C. 2903.04. The trial court imposed a minimum definite sentence of 11 years up to an indefinite term of 16 and one-half years. Count 4 merged with Count 2. On Count 9, the trial court sentenced Appellant to 18 months. Count 10

8

merged with Count 9. Together with the prior sentences imposed, Appellant's total term of incarceration was 17 and one-half years to 23 years.

{¶10} Appellant timely appealed raising three assignments of error.

**Assignments of Error and Analysis**

{¶11} We address Appellant's first and second assignments of error together.

{¶12} Appellant's first assignment of error states: "Appellant's Convictions Were Against the Manifest Weight of the Evidence."

{¶13} Appellant's second assignment of error states: "Appellant's Convictions Were Unsupported by Sufficient Evidence."

{¶14} "'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), citing Black's Law Dictionary (6 Ed.1990) 1433. The appellate court's standard of review for sufficiency of evidence is to determine, after viewing the evidence in a light most favorable to the prosecution, whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 (1991), paragraph two of the syllabus.

{¶15} When evaluating the sufficiency of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 387. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id.* This naturally entails a review of the elements of the charged offense and a review of the State's evidence. *State v. Richardson*, 2016-Ohio-8448, ¶ 13.

9

Case No. 2024-A-0045

**{¶16}** When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other indicated clearly that the party having the burden of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. "Weight is not a question of mathematics but depends on its effect in inducing belief." *Thompkins* at 387. Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates the evidence's persuasiveness. *Id.*

**{¶17}** The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 2021-Ohio-4258, ¶ 22 (11th Dist.); *State v. Antill,* 176 Ohio St. 61, 67 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any, of the outcome of the case and the connection with the prosecution or the defendant. *Id.* This Court, engaging in the limited weighing of the evidence introduced at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 2003-Ohio-7183, ¶ 52 (11th Dist.). The reviewing court "determines whether . . . the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin,* 20 Ohio App. 3d 172, 175 (1st Dist. 1983).

10

Case No. 2024-A-0045

**{¶18}** A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 2013-Ohio-1842, ¶ 32 (11th Dist.).

**{¶19}** In *White I,* we already determined that Appellant's convictions under Counts 6, 8, 9, and 11 were supported by sufficient evidence and were not against the manifest weight of the evidence. *Id.* at ¶ 70. Therefore, we only address Count 2, Involuntary Manslaughter with a predicate offense of Trafficking in a Fentanyl-Related Compound, a first-degree felony in violation of R.C. 2903.04.

**{¶20}** R.C. 2903.04(A), Involuntary Manslaughter, provides: "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." "Involuntary manslaughter is a crime of transferred intent." *State v. Leffel*, 2019-Ohio-1840, ¶ 17 (11th Dist.), citing *Stanley v. Turner*, 6 F.3d 399, 402 (6th Cir. 1993), citing *State v. Losey*, 23 Ohio App.3d 93 (10th Dist. 1985). "Thus, the requisite culpable mental state is the same as the culpable mental state of the underlying offense." *Id.* Further, "[t]he possibility of overdose is a reasonably foreseeable consequence of the sale of heroin." *State v. Patterson*, 2015-Ohio-4423, ¶ 91 (11th Dist.).

**{¶21}** Appellant's conviction for Involuntary Manslaughter has a predicate offense of R.C. 2925.03(A)(1), Trafficking in a Fentanyl-Related Compound, which provides that no person shall knowingly "[s]ell or offer to sell a controlled substance or a controlled substance analog."

11

Case No. 2024-A-0045

{¶22} A person acts "knowingly" when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶23} Appellant argues that the evidence does not support a conviction for manslaughter on three bases: first, that the evidence at trial did not support the conclusion that Appellant engaged in drug trafficking. Second, that the conviction for Involuntary Manslaughter cannot be supported as a result of Trafficking in a Fentanyl-Related Compound because the evidence did not support a "cause-in-fact" conclusion that it was the specific drugs Appellant sold to Travis that caused Thelma's death. Third, that "even if" Appellant's drugs caused Thelma's death, her death was not a foreseeable consequence of Appellant supplying the drugs, i.e. that Appellant could not foresee that his sale of the drugs would cause Thelma's death because he did not know that the drugs he sold would be given to Thelma at all.

{¶24} As to the first argument, Appellant returns to arguments made in *White I,* to wit, whether Appellant did indeed sell drugs to Travis. We rejected these arguments in *White I* and do so again here. *Id.* at ¶ 59 ("Appellant certainly knew he was furnishing drugs to Travis, but nothing more.").

{¶25} Next, as to whether Appellant's selling the drugs to Travis was the cause-in-fact of Thelma's death, under the Involuntary Manslaughter statute, "[g]enerally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct." *State v. Feltner,* 2008-Ohio-5212, ¶ 13 (12th Dist.). "Evidence of a defendant's cause of death can be established through direct

12

Case No. 2024-A-0045

and circumstantial evidence tending to demonstrate to the finder of fact the cause of the victim's death." *State v. Klotz,* 2024-Ohio-2864, ¶ 32 (11th Dist.), citing *State v. Beaver*, 119 Ohio App.3d 385, 393 (11th Dist. 1997).

{¶26} There was some evidence that Thelma had numerous small folds of paper used for drugs that Appellant did not supply. Further, no one testified that they saw Thelma take the specific drugs that Travis bought from Appellant and then gave to Thelma. Appellant believes this lack of evidence is fatal to the State's case.

{¶27} However, there was sufficient, specific evidence that Travis purchased drugs from Appellant, that Thelma paid Travis $20.00 for a two-thirds share of the drug purchase, and that Travis gave those drugs to Thelma immediately before she died as a result of an overdose. The manifest weight of the evidence supports a conclusion that it was the specific drugs that Appellant sold to Travis that caused Thelma's overdose. Therefore, Appellant's Trafficking in a Fentanyl-Related Compound was the cause-in-fact of Thelma's death.

{¶28} Finally, we address whether Thelma's death was a foreseeable consequence of Appellant's trafficking in drugs. In the context of Involuntary Manslaughter, the term "'proximate result' bears a resemblance to the concept of 'proximate cause' in that defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct." *State v. Losey*, 23 Ohio App.3d 93, 95 (10th Dist. 1985); *State v. Gibson*, 1997 WL 402352, *5 (11th Dist. June 27, 1997) (citing *Losey*).

{¶29} This Court has consistently held that "[t]he possibility of overdose is a reasonably foreseeable consequence of the sale of heroin." *State v. Patterson*, 2015-

Ohio-4423, ¶ 91 (11th Dist.). Therefore, Thelma's death was certainly a foreseeable consequence of Appellant's sale of a fentanyl-related compound. That the State did not present evidence that Appellant's sale of drugs had previously caused overdoses or other deleterious effects is of no moment.

{¶30} Unlike an offense of Involuntary Manslaughter with a predicate offense of Corrupting Another with Drugs as we addressed in *White I*, Count 2 as reviewed here does not require the State to prove Appellant knowingly furnished the drugs to Thelma. Rather, the State's burden was to prove that Thelma used the drugs that Appellant trafficked and that her overdose was caused by those drugs. The State did so, and Appellant's conviction on Count 2 was supported by competent, credible evidence.

{¶31} Accordingly, Appellant's first and second assignments of error are without merit.

{¶32} Appellant's third assignment of error states: "Appellant's Sentence is Contrary to Law."

{¶33} "There are three ways an appellant can challenge consecutive sentences on appeal." *State v. Gibbs,* 2022-Ohio-4792, ¶ 64 (11th Dist.). First, the appellant may argue that the sentencing court failed to state the findings for consecutive sentences that R.C. 2929.14(C)(4) requires. *State v. Torres*, 2003-Ohio-1878, ¶ 18 (11th Dist.); R.C. 2953.08(G)(1). Second, the appellant may argue that the record clearly and convincingly does not support the findings the sentencing court made to justify consecutive sentences. *State v. Lewis*, 2002-Ohio-3373, ¶ 7 (11th Dist.); R.C. 2953.08(G)(2)(a). Third, the appellant may argue that his sentence is clearly and convincingly otherwise contrary to law. R.C. 2953.08(G)(2)(b).

14

**{¶34}** R.C. 2929.14(C)(4) provides:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶35}** In making its findings for consecutive sentences, the sentencing court is required to engage in the analysis for consecutive sentencing and specify the statutory criteria warranting its decision. *State v. Bonnell*, 2014-Ohio-3177, ¶ 26. While the sentencing court is not required to state exact reasons supporting its findings, the record must contain a clear basis upon which a reviewing court can determine that the sentencing court's findings for imposing consecutive sentences are supported by the record. *Id.* at ¶ 27-28.

**{¶36}** In *White I*, we concluded that the trial court had made the necessary findings to impose consecutive sentences, and so conclude here. *Id.* at ¶ 78.

15

Case No. 2024-A-0045

**{¶37}** However, we declined to pass judgment on whether the record supported the imposition of consecutive sentences because we were remanding the case for resentencing and did not want to rule "absent a complete record on the issue we are asked to decide." *Id.* at ¶ 80. This issue is now properly before us.

**{¶38}** Appellant's argument is that the record does not clearly and convincingly support the findings the trial court made to justify imposing consecutive sentences because he is a 71-year-old disabled Vietnam veteran with no prior felony convictions. He maintains that the imposition of a consecutive sentence is the functional equivalent to a life sentence, which is inappropriate in a case where there was no direct evidence that he ever met the victim.

**{¶39}** We disagree. The record clearly and convincingly supports the trial court's findings imposing consecutive sentences. Appellant's offenses took place over the course of three separate days and represented a consistent engagement in criminal activity surrounding trafficking in drugs. The evidence showed Appellant sold drugs from at least three locations: an antique store he operated, the E. 17th Street residence, and via delivery from his vehicle. His criminal activity resulted in the death of another through an overdose. The offenses were committed as part of one or more courses of conduct, and the harm caused was so great that no single prison term adequately reflects the seriousness of the offender's conduct.

**{¶40}** Having independently reviewed the record, we find that the trial court did not err in imposing consecutive sentences.

16

{¶41} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas is affirmed.

MATT LYNCH, J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2024-A-0045